[Civ. No. 30674. First Dist., Div. One. May 23, 1972.]

LEONARD ALFRED MIRAMONTES, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

878

## COUNSEL

Lewis J. Yapp for Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Edward P. O'Brien and Robert R. Granucci, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

SIMS, J.—Petitioner, under the provisions of subdivision (i) of section 1538.5 of the Penal Code, seeks review of an order denying his motion to suppress in an action in which he is charged with possession of marijuana for sale in violation of section 11530.5 of the Health and Safety Code, and with transportation of marijuana in violation of section 11531 of that code. An alternative writ of mandate was issued so that it could be determined whether the marijuana, in footlockers shipped via air freight by petitioner, had been discovered and seized in violation of principles enunciated in *People* v. *McGrew* (1969) 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1] [cert. den. 398 U.S. 909 (26 L.Ed.2d 67, 90 S.Ct. 1689)]; and *Abt* v. *Superior Court* (1969) 1 Cal.3d 418 [82 Cal.Rptr. 481, 462 P.2d 10].

Petitioner asserts that the marijuana which forms the basis of the foregoing charges was discovered and seized as the result of a search without a search warrant and without probable cause; that the trial court erred in denying his motion because the prosecution failed to produce at the hearing the first law enforcement officer who observed the contraband; that the airline agent who opened a footlocker and first observed the contraband was acting as an agent of the police; and that in any event the airline agent, as a quasi-governmental agent, was subject to the same restrictions as the police, and any evidence obtained through his allegedly unconstitutional action should be suppressed.

The record reveals that the contraband was discovered in a reasonable search conducted by the airline agent without the suggestion or the complicity of the police; that it was in plain sight of both officers who viewed it; that it was properly seized by the second officer who viewed it; and that the prosecution was not required to produce all witnesses to the events which transpired in connection with the discovery, viewing and seizure of the marijuana. The alternative writ must be discharged and the petition for a peremptory writ of mandate must be denied.

At the hearing on petitioner's motion which was heard jointly with a motion to dismiss under section 995 of the Penal Code, he only qualifiedly stipulated to the use of the testimony which had been adduced and reported in connection with the preliminary examination into the charges. His counsel stated, "I have no objection to stipulating that the transcript can go into evidence as it stands but I still feel that the district attorney should produce. . . ." After some discussion the deputy district attorney indicated he was not going to rest on the transcript, but that he would present direct evidence to show the admissibility of the seized contraband. The question of the use of the reported testimony was left unresolved. Subsequently it was expressly stipulated that the testimony of the witness to petitioner's receipt of the lockers at their destination, as given at the preliminary examination, would be received in connection with the motion. In his petition, he incorporates the complete transcript of the testimony taken at his preliminary hearing, and, as well, the transcript of the testimony received at the hearing on the motion. His statement of facts refers to the former. It is, therefore, concluded that both records were before the trial court and should be reviewed in this proceeding.

Gary Donald Rieven, the night supervisor in the air freight department of Western Airlines at San Diego, received the two footlockers in which the contraband was discovered about 8:30 or 9 p.m. on January 14, 1971.

He had been employed as an air freight clerk for about three and one-half or four years at that time. He had seen and smelled a shipment of marijuana on an earlier occasion in the course of his experience with Western Airlines, and had seen three or four shipments discovered by other airlines using the same freight terminal. He had once observed a shipment of marijuana packed with mothballs at United Airlines, and he had heard that mothballs and shaving lotion, or other items with a strong odor, were used to disguise the odor of marijuana. Under searching cross-examination he denied that he had ever received any particular or general instructions concerning marijuana or drug shipments from any law enforcement agency or officer or any training for the detection of such substances.

On the night in question, when he heard the front door of the freight office open, Rieven, who was working behind a partition, went around the partition and observed the petitioner, who was dressed in white mechanic's overalls with the emblem of the PSA Airline on them, and a brown jacket, dragging two footlockers into the office. Rieven assisted in bringing the lockers in, and requested the information necessary to make out a waybill. Petitioner gave his name and San Diego address as the shipper, and designated himself as the consignee to pick up the goods at San Francisco. He requested that they be shipped on a specific flight, No. 479, that left at 10:20 p.m. He appeared nervous and was unable to state specifically what he was shipping or for whom he was shipping it. He gave several different versions in a period of five minutes, and he indicated he was shipping the lockers for himself, and then later he stated that it was for someone else; then he said his wife had packed the lockers and later he stated that he or someone else had packed them. Rieven took the footlockers into the hangar area and weighed them, returned and completed the waybill, and gave a copy to the petitioner.

Within two or three minutes after the petitioner left, Rieven returned to the locker that was still on the scales and, in the presence of the one freight agent who was on duty with him, removed the pins which held the hinges on the lid of the locker in order to open the lid, which was padlocked. He had noted the odor of mothballs emanating from the locker. Rieven's suspicions were aroused by the petitioner's nervousness, by his belief that petitioner, as an airline employee, could have shipped the lockers on his employer's airline without cost, and by the odor of the mothballs. These factors led him to believe that the locker contained something other than what the shipper had indicated was enclosed, and, because of the odor of mothballs, he suspected that it was marijuana.

When he opened up the lid, Rieven observed opaque green plastic bags,

similar to trash or litter bags, each of which was secured with a rubber band or several rubber bands. On opening up one of the bags in the footlocker he discovered that it contained a number of individual brick-like packages, about 6 inches long and 3 inches wide and about an inch thick, wrapped in brown paper similar to butcher paper, and sealed with tape. He removed one of the bricks, opened up the end and observed and smelled what on an earlier occasion had been indicated to him was marijuana. Rieven then folded the paper back over the end of the brick, replaced it in the plastic bag, and placed the lid back down on top of the footlocker because he did not know who might be coming in with freight.

At the hearing on the motion Rieven testified that he notified his assistant manager who notified the sky marshals at the airport, who in turn notified other authorities. At the preliminary examination he testified that he notified the sky marshals, and that the footlocker was reopened before any law enforcement officer arrived in order to show the assistant manager the contents.

In any event, it is clear that the first officer to arrive on the scene was Paul Herring, a federal narcotic agent. At the hearing on the motion Rieven testified that Herring arrived about 15 or 20 minutes after the original discovery, that the assistant manager, the freight agent, and Rieven himself excitedly told him what had been discovered. No instructions were given by Herring. Rieven asked Herring to follow him to the footlocker which was closed. There was no marijuana, brick, or plastic bag visible. Rieven of his own volition opened the lid, removed the same brick he had opened before, reopened it as he picked it up and turned toward Herring, and showed the contents to him and told him what he, Rieven, thought it was.

At the preliminary examination Rieven testified he was showing the brick and its contents to the assistant manager when the first officer arrived; that since he did not know who it was who had come in he folded over the wrapping and set the brick down on top of the plastic bag; that after the officer identified himself, he was led to the footlocker; that the contents of the brick were not then visible; that he, Rieven, picked up the brick, which was then open so that the agent could see in it, and either handed it to him or held it out to him; and that the officer indicated the contents were marijuana.

After the brick and its contents were exhibited to the federal agent, Rieven laid it back down on top of the bundle in the plastic bag. Although the lid was left open, the marijuana inside the brick-like package prob-

ably was not visible. Agent Herring asked to see the waybill and went into the office.

About five or ten minutes later Charles McLaughlin, a state narcotics officer arrived. He found Herring in the office, and Herring pointed through the window to where the lockers were, by the scales in the terminal. Rieven, who was also in the office, asked McLaughlin to follow him out. The state agent went out with Rieven and observed the open footlocker, and in it two green plastic bags, one of which was opened and appeared to contain wrapped kilos of marijuana from which one brick was protruding. He could not see the contents of the brick-like package but Rieven exhibited to him a package which had been opened and the contents appeared to be marijuana.

McLaughlin ordered that the footlocker be resealed. The two lockers were taken into custody by two officers of the San Diego Police Department who had arrived on the scene. They were instructed to ship the lockers on a flight which would arrive at San Francisco the next day. Other testimony established that the lockers arrived at their destination and that petitioner and a second man were arrested when they claimed the lockers and took them to their rented car. The lockers were returned to the custody of law enforcement officers at the point of destination.

I

The People stipulated that the police had no warrant to search the petitioner's footlockers. The burden was then on the prosecution to justify the search and seizure. (*People* v. *Lanthier* (1971) 5 Cal.3d 751, 755 [97 Cal.Rptr. 297, 488 P.2d 625]; *Abt* v. *Superior Court, supra,* 1 Cal.3d 418, 420; *People* v. *Marshall* (1968) 69 Cal.2d 51, 56 [69 Cal. Rptr. 585, 442 P.2d 665]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 835 [96 Cal.Rptr. 756].) ■ "However strongly convinced officers may be that a search will reveal contraband, their belief, whether based on the sense of smell or other sources, does not justify a search without a warrant." (*People* v. *Marshall, supra,* 69 Cal.2d 51, 57. See also *Abt* v. *Superior Court, supra,* 1 Cal.3d 418, 421; *People* v. *McGrew, supra,* 1 Cal.3d 404, 409.) *People* v. *Marshall* also points out, "It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents. A search demands a search warrant." (69 Cal.2d at p. 59. See also *Abt* v. *Superior Court, supra,* 1 Cal.3d 418, 421; *People* v. *McGrew, supra,* 1 Cal.3d 404, 410; and *People* v. *Baker, supra,* 12 Cal.App.3d 826, 837-839.)

■ In this case, however, the search of the locker was conducted by the airline agent. It does not appear from the record whether the airline reserved the right to search all baggage. (Cf. *Abt* v. *Superior Court, supra,* 1 Cal.3d at p. 420; *People* v. *McGrew, supra,* 1 Cal.3d at pp. 410-412; and *People* v. *Superior Court [Evans]* (1970) 11 Cal.App. 3d 887, 889-890 [90 Cal.Rptr. 123].) Nevertheless, the airline agent reasonably suspected that the shipment was other than represented. "As a common carrier an airline is under a duty to transport goods presented to it for shipment with reasonable dispatch. (*Condakes* v. *Southern Pacific Company* (D.Mass. 1968) 295 F.Supp. 119, 120.) But carriage of the packages with knowledge of their contraband content would have been both a federal and a state crime. (18 U.S.C.A. § 1952; Health & Saf. Code, § 11531.) It was therefore reasonable for the airline agents, alerted by the presence of the smell, to open the packages (*Clayton* v. *United States* (9th Cir. 1969) 413 F.2d 297) and, when on doing so they discovered what appeared to be marijuana in commercial quantities, to call on the police for expert assistance." (*People* v. *Howard* (1971) 21 Cal.App.3d 997, 1000 [99 Cal.Rptr. 47]. See also *People* v. *Lanthier, supra,* 5 Cal.3d 751, 755-756; *Weinberg* v. *Superior Court* (1971) 21 Cal. App.3d 1018, 1023 [99 Cal.Rptr. 166]; *People* v. *Baker, supra,* 12 Cal. App.3d 826, 837-838; and *People* v. *Gordon* (1970) 10 Cal.App.3d 454, 460-461 [89 Cal.Rptr. 214].)

■ In any event, ". . . [t]he Fourth Amendment's prohibition against unreasonable searches and seizures does not apply to searches by private individuals not acting in concert with or as agents of governmental authorities. [Citations.]" (*People* v. *Houle* (1970) 13 Cal.App.3d 892, 895 [91 Cal.Rptr. 874]. See also *Burdeau* v. *McDowell* (1921) 256 U.S. 465, 475 [65 L.Ed. 1048, 1050, 41 S.Ct. 574, 13 A.L.R. 1159]; *People* v. *Superior Court [Smith]* (1969) 70 Cal.2d 123, 128-129 [74 Cal.Rptr. 294, 449 P.2d 230]; *People* v. *Baker, supra,* 12 Cal.App.3d 826, 834; *People* v. *Superior Court [Evans], supra,* 11 Cal.App.3d 887, 891; *People* v. *Superior Court [York]* (1970) 3 Cal.App.3d 648, 659-660 [83 Cal.Rptr. 732]; *People* v. *Katzman* (1968) 258 Cal.App.2d 777, 786 [66 Cal.Rptr. 319]; *People* v. *Randazzo* (1963) 220 Cal.App.2d 768, 770-775 [34 Cal.Rptr. 63]; and *People* v. *Johnson* (1957) 153 Cal.App.2d 870, 872-877 [315 P.2d 468]; and note *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 100 [73 Cal.Rptr. 575, 447 P.2d 967]; and *People* v. *Tarantino* (1955) 45 Cal.2d 590, 595 [290 P.2d 505].)
■ The search conducted by the airline agent did not render the marijuana which he discovered inadmissible in evidence.

In this case, unlike *People* v. *McGrew, supra* (1 Cal.3d at p. 409), and

*Abt* v. *Superior Court, supra* (1 Cal.3d at p. 421), there was no search by, or under the authority or instructions of, the officers. The evidence is clear that the contraband was exhibited to the officers by the airline agent. Officer McLaughlin, having observed the contraband, was not only authorized, but was duty bound, to seize it. (See *People* v. *Lanthier, supra,* 5 Cal.3d 751, 756; *Weinberg* v. *Superior Court, supra,* 21 Cal.App.3d 1018, 1023; *People* v. *Gavin* (1971) 21 Cal.App.3d 408, 413, fn. 3 [98 Cal.Rptr. 518]; *People* v. *Schad* (1971) 21 Cal.App.3d 201, 209 [98 Cal.Rptr. 439]; *People* v. *Superior Court* [*Evans*], *supra,* 11 Cal.App.3d 887, 891; and *People* v. *Superior Court* [*York*], *supra,* 3 Cal.App.3d 648, 658.)[1]

The trial court was warranted in concluding that the prosecution had shown that there was no illegal search by or under the direction of law enforcement agents, and that the officers only seized what had appeared to be marijuana when exhibited to them.

## II

■ At the hearing on the motion to suppress, petitioner's counsel objected to the examination of the state agent on the ground that the federal officer to whom the contraband was first exhibited was an indispensable witness on the issue of whether there had been an unlawful search and seizure. In the course of argument on the motion, he stated that he had requested that the district attorney's office produce Herring, and that he had been advised the witness was in Argentina. The court overruled the objection.

Petitioner has cited no precedent for the proposition that the prosecution must produce as a witness every person whom the record reveals may have some knowledge of the events under review. The law is to the contrary. ■ "The People are not required to call any particular witness so long as the material evidence relating to the charge against defendant is produced in a manner according him a fair trial. (*People* v. *Kiihoa* (1960) 53 Cal.2d 748, 752. . . .)" (*People* v. *Moran* (1970) 1 Cal.3d 755, 761 [83 Cal.Rptr. 411, 463 P.2d 763].) ■ The prosecution has not attempted to suppress any evidence, nor does it appear that

---

[1]The People assert that there was no seizure until the footlockers were seized in connection with petitioner's arrest in San Francisco. It is obvious that they were seized in San Diego when they were turned over to the local authorities for reshipment the following morning. That was more than a mere detention for investigation. (Cf. *United States* v. *Van Leeuwen* (1970) 397 U.S. 249, 253 [25 L.Ed.2d 282, 286, 90 S.Ct. 1029].) Nevertheless the shipment of the footlockers in order to trap petitioner or whomsoever might call for them did not invalidate the earlier lawful seizure.

it has arranged the hearing so that the federal officer would be absent. (Cf. *Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847, 851-854 [83 Cal. Rptr. 586, 464 P.2d 42]; and *People* v. *Kiihoa* (1960) 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673].) Since the officer was responsible to federal and not state authority, the district attorney cannot be expected to control his appearance as a witness. If the petitioner did not want to proceed without Herring's testimony he should have moved for a continuance.

Petitioner has also missed the point that the seizure which he attacks was the result of the observations of the state officer, not of the federal officer. Even if the federal officer had ruthlessly violated petitioner's rights, if the observations and seizure made by the state officer were independently lawful, the evidence was not secured as a result of the exploitation of the federal officer's illegal conduct. (See *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422-423 [96 Cal.Rptr. 455, 487 P.2d 1023]; and *People* v. *Baker, supra,* 12 Cal.App.3d 826, 842-844.)

Finally, it is noted that it may be that under federal law the federal officer had a greater right than a state agent to investigate at the request of a public carrier. (See cases collected, *People* v. *Baker, supra,* 12 Cal. App.3d at p. 837.) A state doctrine which excluded evidence obtained as a result of proper federal action, might uphold the sanctity of the state's ideals of the administration of criminal justice, but it would not serve to deter such future action by federal agents.

No error can be predicated upon the prosecution's failure to call the federal agent as a witness.

### III

■ When a search by a private individual is part of a coordinated joint operation conducted by the police with a private agent, or when the police request or direct a search, or stand idly by and fail to protect a citizen's rights against an unauthorized search, the evidence thereby secured will be excluded. (*Stapleton* v. *Superior Court, supra,* 70 Cal.2d 97, 102-103. See also *People* v. *Tarantino, supra,* 45 Cal.2d 590, 595.) Petitioner's reliance on this doctrine founders on his failure to establish that the airline agent was acting other than on his own initiative in order to protect his employer's airplanes from being used for the illegal transportation of marijuana. In *People* v. *McGrew, supra* (1 Cal.3d at p. 409) and *Abt* v. *Superior Court, supra* (1 Cal.3d at p. 421), the court found

it unnecessary to determine whether the airline agent was acting as an agent of the police in opening the consigned shipment.[2]

In *People* v. *Superior Court* [*Evans*], *supra,* the court held that the trial court erred in suppressing the evidence. It concluded, on facts similar to those in this case, "While the trial court found that Grantham was acting as an agent of the police, that finding is totally unsupported by the record. It is that lack of evidentiary support which renders the order here reviewed by us erroneous." (11 Cal.App.3d p. 891.) A hearing in the Supreme Court was denied. (See also *People* v. *Schad, supra,* 21 Cal.App.3d 201, 209-210, and *People* v. *Houle, supra,* 13 Cal.App.3d 892, 895-896.)

In *People* v. *Superior Court* [*Evans*], *supra,* the opinion states: "While Grantham suspected that the package might contain some form of contraband, he testified unequivocally that the latter suspicion was incidental and not the prime reason for opening the package. We conclude therefore that the original opening was conducted by Grantham solely as the agent of United Airlines and not as an agent of the police." (11 Cal. App.3d at pp. 891-892.) Petitioner assumes from this statement that if the agent opens a shipment because of a suspicion of contraband he is automatically an agent of the police. He relies upon an isolated answer given by the airline agent on cross-examination at the preliminary examination as establishing that a search for marijuana was the sole reason the agent opened the package.[3] When cross-examined at the hearing on the motion the agent stated: ". . . I questioned what was in it. At the time, I did not know whether it would be marijuana or whether it would be something else, but his actions were such that it seemed like it might be something other than what he indicated it would be." When confronted with his answer at the preliminary hearing he affirmed, "I thought that there might be marijuana in it, yes." He at no time recanted the other reasons for his suspicions, that is, the consignor's nervousness, and his belief that

---

[2]In *People* v. *Segovia* (Cal.App.) 91 Cal.Rptr. 266 (hearing in the Supreme Court granted Jan. 21, 1971, Crim. No. 15315), the motion to suppress was denied by the trial court because the action of the airline employee was on his own initiative. Because of the intervention of *McGrew* and *Abt* while the case was pending before the Court of Appeal, that court in its vacated order remanded the motion for further hearing to determine whether the contraband was in plain sight, or whether there was danger of imminent removal which would frustrate any attempt at seizure through a warrant.

[3]"Q. Well, then let me straighten something out. I don't mean to imply that you immediately ran and opened it because of this, but my point is you did open it within a couple of minutes and the reason you opened it in view of the smell of mothballs was because you felt there might be marijuana in it, is that correct? A. Yes, sir."

the consignor could have shipped his goods without cost on his employer's airline.

In any event, the cited case recognizes that the agent, even if he opened the shipment because he suspected it might contain contraband, "was acting as a concerned citizen to aid the police" and not as their agent. (11 Cal.App.3d at p. 892.) Moreover, as pointed out above, the agent had a legitimate interest in preventing the use of his employer's facilities for the unlawful transportation of contraband. (See *People* v. *Howard, supra,* 21 Cal.App.3d 997, 1000.)

■ The record neither factually nor legally requires a finding that the airline agent was acting as an agent or under the direction of the police.

## IV

Petitioner finally asserts that the airline agent should be considered as an "institutionalized private searcher," and as such be subject to all restraints of a law enforcement officer. (See Note, *Seizures by Private Parties: Exclusion in Criminal Cases* (1967) 19 Stan.L.Rev. 608, 614-618; and *Stapleton* v. *Superior Court, supra,* 70 Cal.2d 97, 100, fn. 3.) The note refers to "store and hotel detectives, company guards, privately hired campus police, and other groups engaged in what might be termed a security and police function." (19 Stan.L.Rev. at p. 615.) It does not attempt to balance the competing interests of shippers who accept waybills consenting to examination of their shipments, and freight agents who may seek to protect their employers from being exploited by those who would ship at improper tariffs, or use their facilities for transportation of contraband.

When and if there is a misuse of the airlines prerogative under the direction or in cooperation with the police, any resulting search or seizure can be rendered fruitless for prosecution under existing rules. There is no warrant for establishing or extending the proposed restriction on the use of seized evidence to the situation posed by this case.

The alternative writ of mandate is discharged and the petition for a peremptory writ of mandate is denied.

Molinari, P. J., and Elkington, J., concurred.