[Crim. No. 20772. Second Dist., Div. Two. Apr. 25, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAUDE WILLIAM THOMPSON, Defendant and Appellant.

## COUNSEL

Westwick, Collison & Talaga and Robert J. Graham for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Rodney Lilyquist, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HERNDON, Acting P. J.—**

### Statement of the Case

A jury found appellant guilty of possession of marijuana, a lesser offense necessarily included in the offense of possession for sale as charged in the indictment. On this appeal from the judgment of conviction he advances the following contentions:

(1) The warrantless search of the trunk in which the contraband was found was unlawful. (2) The prosecutor's questions concerning appellant's prior narcotics offenses constituted prejudicial misconduct. (3) The prosecutor's questions about appellant's silence after being advised of his *Miranda* rights constituted prejudicial misconduct.

For good reason the sufficiency of the evidence to support the verdict and judgment is not questioned. Overwhelming evidence establishes appellant's guilt to a moral certainty. His own testimony is so thoroughly contradicted and so inherently improbable in material particulars that almost certainly it must have impressed the jury as being transparently false. The record indicates that appellant was engaged in a rather large scale traffic in marijuana. The contraband contained in the two trunks involved in this case weighed over 50 pounds. Its approximate value was $1,750 to $2,000 wholesale and $8,000 retail.

## Summary of the Evidence

In the early summer of 1969, Terry Warren and Scott Braithwait went to Nebraska from Santa Barbara to harvest marijuana. When they later returned to California they brought with them a trunk containing marijuana. Approximately a month later Sam Anderson and Jim Mohl harvested and sent a trunk of marijuana from Nebraska to Terry Warren in Santa Barbara. Warren, Gregory Huglin and appellant sold the trunk of marijuana for $1,500. Appellant's share was $200 to $300 and three or four pounds of marijuana.

The witness Gregory Huglin, who was granted immunity from prosecution, testified that he, Warren and appellant later planned to harvest and market more marijuana. According to their plan, Warren and Huglin were to go to Nebraska, send a trunk of marijuana back to appellant who would send them some money, and the two would then harvest more marijuana. They would then drive out to the California-Nevada border pulling a U-Haul trailer load of approximately one ton of marijuana. Appellant would meet them at a specified lodge and help transport the marijuana across the border. Appellant spoke of persons in Los Angeles who would buy the marijuana and the expected price was between $50,000 and $75,000. With the proceeds, appellant, Warren and Huglin planned to go to Australia.

In the first part of September, Warren and Huglin made preparations for their trip to Nebraska. Appellant was driving the two of them to the Los Angeles airport when he began to have trouble with his car. They returned to Santa Barbara, stayed at appellant's apartment overnight, and the next morning took a flight from Santa Barbara to Los Angeles. From Los Angeles Warren and Huglin flew to Omaha and then took a bus to Norfolk.

Warren and Huglin located marijuana which apparently grew wild in the Norfolk area and began harvesting it with the help of Sam Anderson, Jim Mohl[1] and other persons from Nebraska. They dried the marijuana in their apartment. Warren and Huglin telephoned appellant almost every evening; they told appellant when the shipment of marijuana would be sent. Appellant was not to pick up the trunk if it no longer had a lock on it. They sent along another smaller trunk because they could not get all of the marijuana into the one trunk.

On the same day that Warren and Huglin sent the marijuana to appellant, September 19, they were arrested by Nebraska State Patrol Officer

---

[1]Both Anderson and Mohl testified for the prosecution after having been granted immunity.

Eugene Hastreiter who testified at the trial. Officer Hastreiter found the shipping receipt for the two trunks in Warren's car.

On September 20, 1969, Detective Hrock of the Santa Barbara Police Department received a telephone call from Lieutenant Rowe of the Nebraska State Patrol. Rowe advised Hrock that he had two named suspects in custody for violation of (Nebraska) state naroctic laws in connection with marijuana. He also said he had a strong suspicion that the suspects arrested by his department had sent, via air freight, two trunks containing approximately 74 pounds of marijuana to the Santa Barbara area. After preliminary investigation Detective Hrock learned that the two suspects were known to the Santa Barbara Police Department as narcotic users.

On the same day, Paul Harvey, United Air Lines senior agent in Santa Barbara, received a communication from the Omaha office of the airline advising him concerning the shipment of the trunks suspected of containing marijuana. Harvey thereupon called the Santa Barbara Police Department and the officers there indicated that they had received similar information. Harvey informed the police that he was going to open the trunks when they arrived and requested the presence of one of the officers to identify any contraband found. Harvey stated that he had authority to search any package if he had reason to believe that it contained contraband. Officer Hrock told Harvey that he would proceed to the airport and stand by while Mr. Harvey opened the shipment.

Officer Hrock arrived at the airport at about 4 p.m. and contacted Harvey and service manager Carlson. Carlson said that they had authority to open packages suspected of containing contraband.

At about 5 p.m. Flight 842 arrived and Harvey took the two trunks into the baggage room. He unfastened the belt, removed tape from the lock, and opened the smaller of the two trunks. He removed a bag and took out a small sample of substance which he handed to Officer Hrock. The officer inspected the green leafy plant material and concluded that it was marijuana. The bag was placed back into the trunk, the trunk was resealed, and the two trunks were left in the storage room.

The air freight waybill which accompanied the shipment indicated that the trunks were to be delivered to appellant as consignee and that he could be reached at the airline coffee shop. An airline official attempted to contact appellant but was unable to reach him until about 9:30 or 9:45. Appellant was then informed by telephone that his air freight shipment could be picked up.

Appellant called Don Webber, an employee of Air West, at his home and asked him if he would come to the airport and look at some air freight

that he had been expecting. Webber testified that he went to the airport, talked to appellant and then went into the United Air Lines baggage area. When he entered the room, he "picked up some bad vibrations." Although he felt that something was wrong, he went back and told appellant that everything was all right as far as he knew. Immediately thereafter appellant went down to the baggage claim area.

Appellant asked the station agent if he had a shipment for Bill Thompson and received an affirmative answer. Appellant signed the delivery receipt and was given the two trunks. He took them out to his car, placed them inside, and locked the doors. Appellant then looked in the direction of one of the officers who was in the area and immediately thereafter began walking back toward the airport lobby. Appellant was arrested about 25 feet from his car.

After appellant was advised of his constitutional rights, he asked, "Is this about the trunks?" Officer Edward Piceno replied that it would be better for him not to say anything more and that he would be interviewed later by Officer Hrock. Officer Piceno searched appellant and found in his wallet a Western Union money order receipt. The trunks containing the contraband were seized.

Appellant took the stand and testified that in September of 1969, Terry Warren and Greg Huglin told him they were going to Nebraska to go to school. He testified that it was his understanding that they did not plan to harvest marijuana when they left for Nebraska on this occasion although he knew that they had gone to Nebraska for that purpose previously.

Further contradicting the testimony of Huglin, appellant testified that prior to the shipment of the trunks from Nebraska, Huglin and Warren called him by telephone and told him that they were returning to Santa Barbara and that they were sending some of their clothing to him by air freight, but that they never told him that they would be shipping marijuana.

Appellant testified that before he received the call from United Air Lines advising him that he could pick up his air freight, he had been receiving telephone calls from unknown persons asking whether he had received any parcels from Warren. This caused him to fear that "something might be wrong." Therefore, he called Don Webber and asked him to come to the airport, look at the shipment and see if it looked "suspicious." Webber came to the airport, looked at the shipment and said that it seemed all right. Appellant then went and picked up the trunks, placed them in his car and was arrested as he was walking back to the airport coffee shop.

### The Search and Seizure of the Trunks of
### Marijuana Were Reasonable and Lawful

Appellant contends that a search of one of the two trunks of marijuana involved in this case violated the constitutional proscription of unreasonable searches and was made in the absence of any exigent circumstances sufficient to justify the opening of the trunk without a search warrant. He argues that the opening of the trunk by the airline agent in the presence of a police officer constituted a part of a joint activity "sufficient to subject 'private' searches to constitutional warrant requirements." He places primary and major reliance upon *People* v. *McGrew,* 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1], and *Abt* v. *Superior Court,* 1 Cal.3d 418 [82 Cal.Rptr. 481, 462 P.2d 10].

We reject appellant's contentions. We have concluded in this case, as we concluded in the factually similar case of *People* v. *Howard,* 21 Cal. App.3d 997 [99 Cal.Rptr. 47], that the search in this case was reasonable for the same reasons that the Supreme Court sustained the reasonableness of the search in *People* v. *Lanthier,* 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625].

In *Lanthier,* a Stanford University official named Riley received a complaint of a noxious odor emanating from a study hall. Riley used a master key to open a number of student lockers in his efforts to locate the source of the odor. When Lanthier's locker was opened, Riley found a brief case therein. Upon removing it Riley realized that the odor was emanating directly from the brief case. Upon opening the brief case he found 38 packages which he "suspected might be something like marijuana."

After consultation with other university officials, Riley turned the brief case over to a university police officer who, in turn, contacted the Santa Clara Sheriff's Department. A deputy sheriff responded to the call. He testified that officials of the university asked him to inspect the brief case to determine if he could identify the contents. The university police officer unfastened the keys on the brief case, opened it, and exposed its contents. Deputy Saldivar removed one of the packets and by sight and smell recognized the material to be marijuana. Defendant was subsequently arrested when he returned to his locker to reclaim the brief case.

In holding that the warrantless search of the brief case by the school officials and the sheriff was reasonable, the Supreme Court declared that in the circumstances there presented, "the question of who opened or closed defendant's brief case pales into insignificance." The following language of the decision at page 757 is particularly apposite here: "In their effort to identify the contents of defendant's briefcase, finally, it was

reasonable for the university officials to secure professional advice by enlisting the aid of campus and local police. A single consultation by such officials with a police expert on narcotics falls far short, for example, of a general police-instigated exploratory search of student housing or belongings in the hope of turning up contraband. Rather, the officials' conduct in the case at bar is analogous to that of 'the landlord or bailee who innocently discovers the suspicious circumstances, and seeks expert advice as to the nature of the use to which his premises or facilities are being appropriated. The latter would be no more than an extension of the plain-sight rule, by augmenting the observations of the layman with the expertise of the police.' (*People* v. *Baker* (1970) 12 Cal.App.3d 826, 838 [90 Cal. Rptr. 508].)"

In *People* v. *Howard, supra,* 21 Cal.App.3d 997, airline agents had in their possession two packages which had been brought to them for interstate shipment at 1 o'clock in the morning. The agents of the carrier suspected possible illegal activity because of the time and manner in which the packages were being shipped and because of the appearance and odor of the packages. The agents opened the packages, found what they believed to be marijuana, and called police. A police officer arrived without a warrant, opened the packages, and seized the marijuana therein. We sustained the trial court's holding that the search was reasonable, relying upon the decision of the Supreme Court in *Lanthier,* among others.

In the case at bench, the trial court expressed the finding upon which it based its ruling as follows: "That in view of the information obtained from Nebraska, coupled with the arrival of the described article containing the contraband, the officers had reasonable grounds to believe that a felony was being committed by the defendant but that due to the hour of arrival, namely, 5:00 p.m., and the fact that the suspect article was being received for delivery to the defendant, an emergency existed which rendered the risk too great of losing the evidence by taking the time to obtain a search warrant."

Appellant has argued that no emergency confronted the airline agents and the police because "from the evidence before the court, it was crystal clear that the trunks would not be picked up until appellant was notified by telephone that they had arrived." The fallacy of this argument is obvious. In the circumstances of this case, the airline officials and the police could reasonably regard it as a probability that the sender of the shipment would have telephoned or wired the consignee the scheduled arrival time of the flight on which the contraband was being shipped. This act of precaution on the part of the participants in such a criminal course of procedure was not only consistent with the instructions for delivery actually

given by the consignor, but also it was so logically indicated as to be regarded as probable.

The following argument of appellant appears to be both fallacious and self-defeating: "The danger of appellant's appearing at the United Airlines baggage claim counter to claim the trunks was clearly virtually nil. However, had appellant appeared to pick up the trunks, there was still no danger of his removing the trunks from the premises. The trial court specifically found that there was probable cause to arrest appellant immediately prior to the time that the trunk was opened. Thus, had appellant appeared to claim his trunks, he could and would have been promptly arrested. The trunks could then have been searched incidental to his arrest; or, if necessary, they could have been seized and a search warrant procured."

■ Since appellant in this case concedes the existence of probable cause for his arrest derived from facts entirely unrelated to the opening and inspection of the smaller trunk in the airline terminal, the seizure of the trunks which appellant had placed in his automobile was lawful even if it be assumed, arguendo, that the previous opening of the trunk and the inspection of its contents were unlawful. The trunks in this case were seized contemporaneously with an arrest, the validity of which is necessarily conceded. It is settled law that an automobile may be searched for evidence related to an arrest made with probable cause. (*Carroll* v. *United States,* 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280].)

The inspection of the one trunk only confirmed the fact which the officer already had probable cause to believe to be true, namely, that the trunks contained contraband. It would necessarily follow, therefore, that any assumed error in the refusal to suppress the evidence found in the trunk which was initially opened would be harmless beyond a reasonable doubt, for the evidence obtained from the other trunk would retain its character as validly secured evidence and in itself furnish more than sufficient evidence to uphold the judgment of conviction for possession of marijuana. In this respect the evidentiary situation is comparable to that of a valid second confession obtained subsequent to an invalid first confession. If the second confession stands by itself, it is admissible in evidence and will support a judgment of conviction. (*United States* v. *Bayer* (1947) 331 U.S. 532 [91 L.Ed. 1654, 67 S.Ct. 1394].)

But even beyond this, however, appellant's concession of probable cause for the arrest concedes the validity of the entire seizure, for no tangible evidence was seized earlier. ■ Appellant's contention, properly viewed, relates solely to a proposed suppression of *testimony* by the airline agent and others about what they had seen on the initial opening of the trunk.

Again, assuming that such testimony should have been suppressed, a failure to do so is harmless error beyond a reasonable doubt and has no effect on the subsequent valid seizure of the trunk based on unrelated probable cause. Thus, under no theory was the court required to suppress evidence validly seized in connection with an arrest made on probable cause.

However, in this case the evidence supports the finding that the trunk was opened by the airline employee acting on his own initiative and in the exercise of a right legally conferred upon him. (*People* v. *Howard, supra,* 21 Cal.App.3d 997, 999-1000; *People* v. *Superior Court,* 11 Cal.App.3d 887, 891-894 [90 Cal.Rptr. 123].) The police officer who was present at the opening believed reasonably and in good faith that the conduct of the airline official was lawful and proper, believing it to be, as the Supreme Court commented in *Lanthier,* analogous to that of " 'the landlord or bailee who innocently discovers the suspicious circumstances, and seeks expert advice as to the nature of the use to which his premises or facilities are being appropriated.' " (*People* v. *Lanthier, supra,* 5 Cal.3d at p. 757; *People* v. *Pranke,* 12 Cal.App.3d 935, 942-945 [91 Cal.Rptr. 129]; see also, *People* v. *Hill,* 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521].)

■ As we pointed out in *People* v. *Minervini,* 20 Cal.App.3d 832, 839 [98 Cal.Rptr. 107], if a private citizen has a right to search premises or property under sufficient attendant circumstances by virtue of his own personal relationship to the premises or property in question, that right would not be diminished by his obtaining police assistance in exercising his right or even if he was encouraged by the police to so exercise it. (Cf. *People* v. *Plane,* 274 Cal.App.2d 1 [78 Cal.Rptr. 528]; *People* v. *Raine,* 250 Cal.App.2d 517 [58 Cal.Rptr. 753]; *People* v. *Henning,* 18 Cal.App. 3d 872 [96 Cal.Rptr. 294].)

Where there is danger of imminent destruction, removal or concealment of property reasonably believed to contain contraband, a warrantless search is justified. (*People* v. *McGrew, supra,* 1 Cal.3d 404, 409; *People* v. *Marshall,* 69 Cal.2d 51, 56-57, 61 [69 Cal.Rptr. 585, 442 P.2d 665].) ■ In the case at bench, the shipment was available for immediate delivery to appellant. To prevent removal of the shipment reasonably believed to contain contraband, it could be seized without a warrant. (*People* v. *Gordon,* 10 Cal.App.3d 454, 460-461 [89 Cal.Rptr. 214]; *People* v. *Temple,* 276 Cal.App.2d 402, 409-412 [80 Cal.Rptr. 885].)

*The District Attorney's Questions Concerning Appellant's*
*Prior Narcotics Offenses and His Silence at the Time of*
*His Arrest Did Not Constitute Prejudicial Error*

Appellant contends that the district attorney improperly questioned him as to whether or not he had previously smoked or sold marijuana.

We conclude that under the circumstances of this case, the contention must be rejected. The witness Huglin had testified that he, Terry Warren and appellant had planned to have marijuana harvested in Nebraska and shipped to California for sale and that pursuant to this plan the two trunks of marijuana in question were shipped to appellant. Additionally, the witness testified that approximately a month prior to his going to Nebraska, a trunk of marijuana had been sent to Warren from friends in Nebraska and that he, Warren and appellant had cooperated in selling it.

On cross-examination the district attorney asked appellant, "Would you please start by telling the jury how many times you have smoked marijuana?" The trial court overruled defense counsel's objection to the question and appellant responded that he had smoked marijuana probably eight or nine times before the incident in question.

It is well settled in California that except when it shows merely criminal disposition, evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. Evidence is admissible where it tends logically, naturally and by reasonable inference to establish any fact material to the People's case or to contradict any fact sought to be proved by the defense. (*People* v. *Durham,* 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Kelley,* 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Peete,* 28 Cal.2d 306, 314-315 [169 P.2d 924]; *People* v. *Ollado,* 246 Cal.App.2d 608, 611-614 [55 Cal.Rptr. 122].) Evidence of other crimes or misconduct may be received to identify the defendant as the perpetrator of the offense or to show the defendant's guilty knowledge, intent, or his common design and plan. (*People* v. *Archerd,* 3 Cal.3d 615, 638-639 [91 Cal.Rptr. 397, 477 P.2d 421]; *People* v. *Schader,* 71 Cal.2d 761, 776 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Westek,* 31 Cal.2d 469, 480 [190 P.2d 9].)

Having in mind appellant's testimony that Huglin had told him that he and Warren were shipping clothing to him, that they never told him that they would be sending him marijuana, and that he believed the trunks in question contained only clothing, it becomes clear that evidence that he had been a user and dealer in marijuana was admissible in that it tended logically, naturally and by reasonable inference to contradict his testimony and to prove his guilty knowledge, intent, and a common plan and design. Moreover, in a prosecution for possession of narcotics, it is incumbent upon the prosecution to prove the defendant's knowledge that he was in possession of narcotics. (*People* v. *Francis,* 71 Cal.2d 66, 73 [75 Cal.Rptr. 199, 450 P.2d 591]; *People* v. *Groom,* 60 Cal.2d 694, 696-697 [36 Cal. Rptr. 327, 388 P.2d 359].) Evidence of other narcotics offenses may be introduced to establish such knowledge. (*People* v. *Gambos,* 5 Cal.

App.3d 187, 194-195 [84 Cal.Rptr. 908]; *People* v. *Soto,* 245 Cal.App.2d 401, 406 [53 Cal.Rptr. 832].)

■ Finally, appellant contends that the prosecution improperly brought to the jury's attention the fact that he had remained silent upon being advised of his constitutional rights and had not given his exculpatory explanation. On cross-examination of appellant, the district attorney asked him if it was not true that at the time he was advised of his constitutional rights, he declined to speak to the police officers about the case. He answered in the affirmative. He was also asked, "Why didn't you tell them that you were expecting clothes if that is the truth?" He answered, "Because I felt the best thing to do under the circumstances until I knew what was actually happening was to have my lawyer present when I talked with them." He answered in the negative when he was asked if it wasn't the truth of the matter that he wanted more time to fabricate a defense.

Since appellant made no objection to these questions in the trial court and made no motion to strike nor any request that the jury be admonished, he is precluded from urging the error on appeal. (*People* v. *De Santiago,* 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Fitzgerald,* 56 Cal.2d 855, 862-863 [17 Cal.Rptr. 129, 366 P.2d 481]; *People* v. *Hampton,* 47 Cal.2d 239, 240-241 [302 P.2d 300]; *People* v. *Pranke, supra,* 12 Cal.App.3d 935, 941.)

Secondly, it is to be observed that it was defense counsel who first raised the subject of appellant's questioning at the police department. On direct examination appellant testified at some length as to what he did say and did not say to the officers after he had been advised of his *Miranda* rights. Thus, it is arguable that the district attorney properly sought to elicit relevant facts to test appellant's credibility rather than to "[embark] on a calculated effort to convert [appellant's] silence into a tacit admission of guilt." (Cf. *People* v. *Andrews,* 14 Cal.App.3d 40, 48 [90 Cal.Rptr. 49]; *People* v. *Perry,* 271 Cal.App.2d 84, 105-106 [76 Cal.Rptr. 725].)

■ Thirdly, even if it be assumed, arguendo, that there was error in the questioning of which appellant has complained, we hold that the assumed error was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The judgment is affirmed.

Fleming, J., and Compton, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1972. Peters, J., was of the opinion that the petition should be granted.